NOT DESIGNATED FOR PUBLICATION

No. 120,736

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ORION GRAF,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*,


MEMORANDUM OPINION

Appeal from Douglas District Court; SALLY D. POKORNY, judge. Opinion filed October 9, 2020. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, for appellant, and *Orion Graf*, appellant pro se.

*Kate Duncan Butler*, assistant district attorney, *Charles E. Branson*, district attorney, and *Derek Schmidt*, attorney general, for appellee.


Before BRUNS, P.J., BUSER, J., and BURGESS, S.J.


PER CURIAM:  Orion Graf appeals from the district court's denial of his K.S.A. 60-1507 motion. Graf originally filed his motion in 2015, and it was summarily denied by the district court. Subsequently, a panel of this court reversed the summary denial and remanded this matter to the district court for an evidentiary hearing on his claim of ineffective assistance of counsel. *Graf v. State*, No. 115,654, 2017 WL 2610757, at *7 (Kan. App. 2017) (unpublished opinion). After holding an evidentiary hearing on

1

remand, the district court again denied Graf's motion. In this appeal, Graf contends that the district court erred in denying him relief. Finding no error, we affirm.

FACTS

In this K.S.A. 60-1507 action, Graf seeks to set aside his plea of no contest to two counts of breach of privacy. He is currently serving a 216-month sentence in another case after pleading no contest to attempted rape and attempted aggravated criminal sodomy. See *State v. Graf*, No. 116,755, 2018 WL 1352567, at *1 (Kan. App.) (unpublished opinion), *rev. denied* 308 Kan. 1598 (2018). However, this appeal only involves Graf's breach of privacy convictions for which he received probation.

This case was previously before this court in *Graf*, 2017 WL 2610757. In that appeal, a panel of this court summarized the underlying facts as follows:

> "[A]n employee at the Gap clothing store in Lawrence discovered a small camera in a dressing room. The memory card in the camera contained videos of women in various states of undress. The card also contained a photo of a man believed to be the person who placed the camera in the dressing room, later identified as Graf. A Gap employee later spotted Graf in the store and called the police. The police approached Graf at the store, and Graf consented to be interviewed. After a few questions, the officer detained Graf and, during a search of his person, seized two more memory cards and an adapter to allow memory card data to be transferred to a computer. The officer also recovered an Apple iPod Touch from Graf's person and saw in Graf's car in plain view two cameras similar to the one discovered in the dressing room.
>
> "The police then executed two search warrants for Graf's home and car, where they recovered several computers and an encrypted hard drive that contained pornographic videos." 2017 WL 2610757, at *1.

On July 18, 2013, the State charged Graf with 10 counts of breach of privacy in violation of K.S.A. 2012 Supp. 21-6101(a)(6). Shortly before trial, the parties entered

into a written plea agreement. Under the terms of the agreement, Graf agreed to enter no contest pleas on two of the counts of breach of privacy. In exchange, the State agreed to dismiss the remaining counts.

At his plea hearing, Graf acknowledged that he had read, signed, and initialed each page of the 31-paragraph plea advisory. In addition, Graf acknowledged that he had reviewed the plea agreement with his attorney; that he had sufficient time to talk with his attorney about his case; and that he was satisfied with the advice provided to him by his attorney. Moreover, Graf acknowledged that it was his desire to voluntarily enter into the plea agreement and that no promises had been made to him other than those set forth in writing or discussed during plea negotiations.

At the conclusion of the plea hearing, the district court accepted Graf's no-contest pleas and found him guilty of two counts of breach of privacy. Several weeks later, the district court imposed consecutive sentences of eight months for each conviction. However, the district court suspended imposition of Graf's sentence and placed him on probation for 24 months.

On June 30, 2015, Graf filed a pro se K.S.A. 60-1507 motion in which he asserted numerous claims for relief. Significant to this appeal, Graf claimed that his attorney was ineffective for failing to file a motion to suppress the evidence seized during the search of his person and during the execution of the search warrants issued by the district court. On December 11, 2015, the district court summarily denied Graf's K.S.A. 60-1507 motion— without appointing counsel or holding an evidentiary hearing—on the grounds that his claims were conclusory and without factual or legal support. The district court also found the record in the underlying criminal proceeding showed that Graf "was fairly apprised of his rights, and the plea was fairly and understandingly made."

3

Graf timely appealed the summary denial of his K.S.A. 60-1507 motion to this court. On appeal, he alleged that the prosecutor had breached the terms of the plea agreement, that he was incompetent to enter his no-contest pleas, and that his counsel was ineffective in failing to seek to suppress the evidence against him. Although the panel rejected Graf's first two claims, it found that he was entitled to a hearing on the issue of whether his attorney's "performance was deficient in failing to file a motion to suppress." 2017 WL 2610757, at *6. Accordingly, the panel reversed the summary denial as to this issue and remanded the matter to the district court for an evidentiary hearing. 2017 WL 2610757, at *6-7.

On remand, the district court appointed counsel to represent Graf and allowed the parties to file additional memoranda in support of their respective positions on the issue of ineffective assistance of counsel. On May 18, 2018, Judge Sally D. Pokorny—who had signed the search warrants during the investigation of Graf's underlying criminal case—held an evidentiary hearing on Graf's K.S.A. 60-1507 motion. The majority of the testimony presented at the hearing related to the scope of the search warrants and whether Graf's counsel should have moved to suppress any or all of the evidence seized during the execution of the warrants.

Officer Eric Barkley—who initially investigated a "key fob" camera found in the dressing room of The Gap clothing store—testified that he responded after a store employee called the police. The employee reported what she believed to be a small camera that had been discovered in a dressing room. Officer Barkley testified that he went to the store and after speaking to the employee, he was shown the small device found in the dressing room. The officer removed it from the dressing room and took it back into the office of The Gap to dust it for latent prints. After doing so, he took it back to the law enforcement center to view the images contained on the device. According to Officer Barkley, he considered the camera to be abandoned property that had been left at the store.

4

In addition, Officer Josh Leitner, who assisted Officer Barkley in the investigation, testified regarding the training he had received at the Regional Computer Forensic Laboratory. The officer testified that the camera contained images of several females in various states of undress as they tried on clothes in the store's dressing room. Officer Leitner also testified that the camera contained images of a man—wearing black cargo pants and a blue hooded sweatshirt—who appeared to be placing the camera in the dressing room. Because the camera did not have a method of transmitting the images to another source, the officer believed that it was likely the person who placed the camera in the dressing room would come back to the store. As a result, Officer Leitner showed the images of the man to The Gap employees and asked them to contact him if they saw him at the store.

Officer Leitner testified that he received a call from a Gap employee later that day reporting that a man who appeared to be the one seen in the images taken from the hidden camera was at the store. According to Officer Leitner, he approached Graf—who was wearing the same clothing as the man depicted on the video—as he left the store. Graf accompanied Officer Leitner to the law enforcement center for a voluntary interview. After Graf answered a few questions, Officer Leitner placed him under arrest. Officer Leitner testified that during a search incident to arrest, the officer found two memory cards and an iPod in Graf's pockets. However, he did not view the contents of these items until a warrant was issued by the district court. Officer Leitner also testified that when he looked inside the window of a car that had been identified as belonging to Graf, he saw several small cameras laying on the passenger seat that appeared to be similar to the one found in The Gap's dressing room.

Detective Scott Slifer—who prepared the two supporting affidavits and the two search warrants signed by Judge Pokorny on the night of February 23, 2013, and in the early morning hours of February 24, 2013—also testified at the evidentiary hearing. The detective testified regarding his extensive training and experience in forensic

examinations of computers and other electronic devices. This experience included training in the examination of encrypted hardware and software data as well as the disguising of computer files. Detective Slifer also testified that as part of his training, he had been certified as a forensic examiner for the FBI's computer analysis response team and he estimated that he had completed "over a thousand hours of specialized training in computer forensic examination."

According to Detective Slifer, the supporting affidavits presented to the district court to obtain the search warrants contained a detailed factual description of the events that would support the elements of the crime of breach of privacy. He acknowledged that one of the affidavits did not list a specific crime. However, Detective Slifer pointed out that the affidavit seeking a warrant for computer and other electronic equipment from Graf's office expressly stated that the officers were investigating the crime of breach of privacy and cited to the criminal breach of privacy statute.

Although Detective Slifer acknowledged that the language in the search warrants was somewhat broad in scope, he explained that because the investigation included the creation, storage, transmission, and viewing of digital media, it would be difficult to tailor the warrants more narrowly. Detective Slifer testified that small cameras like the one found in The Gap dressing room are often bought on the internet and often require someone to install software to run them. In addition, the detective testified that even if a camera does not require separate software, it still interacts with a computer operating system. As such, software is still required to view the images from the camera or associated memory cards.

Detective Slifer testified that these types of files are frequently stored on a computer and often leave remnants even after they are deleted. The detective testified that in cases involving digital media and storage, suspects often try to hide their activities by encrypting, password-protecting, disguising, or renaming files. Passwords and encryption

are also frequently managed by software. Knowing that Graf was a Ph.D. student and teaching assistant at the University of Kansas—as well as knowing that Graf's wife had alleged that he had also secretly filmed her—Detective Slifer testified "it probably was likely that there would be some sort of hiding or securing of the files."

Specifically, Detective Slifer explained the need to use broad language in the search warrants as follows:

> "Pictures, videos, I know can be hidden. We have had extensive training on that. Operating system files tell us if the pictures or videos were viewed, registry information, things like that. Software programs layer on top of that . . . to enable somebody to view it. Internet history tells me whether or not he is interested in this type of thing, including buying cameras and things like that. I can't think of a type of computer file that a video or picture couldn't be hidden as or renamed to be or a portion of that hard drive that a computer or video file or the evidence that we were looking for could reside on. . . . I did not believe that I could restrict myself further to conduct a search."

John Frydman—who had served as Graf's trial counsel—also testified at the evidentiary hearing. Frydman—who had been practicing law since 1986 and was retained by Graf—testified about his experience as a criminal defense attorney. Frydman testified that based on the facts of this case and his knowledge of the law, he did not consider the search warrants issued in this case to be overbroad. He acknowledged that he never specifically discussed with Graf the possibility of filing a motion to suppress. Frydman explained that in light of the evidence against Graf, the primary defense strategy was to obtain a favorable plea deal. In Frydman's opinion, Graf ultimately received a good plea deal. He believed this to be especially true in light of the negative publicity the case had received in Lawrence and surrounding communities.

At the conclusion of the evidentiary hearing, the district court took the motion under advisement. In addition, the district court granted the parties leave to file additional

7

written briefs. On January 15, 2019, the district court issued a comprehensive 12-page memorandum decision denying the K.S.A. 60-1507 motion.

In its memorandum decision, the district court found that the search warrants executed in this case were not overly broad and authorized the seizure of "data" contained on Graf's computer and other electronic devices. Likewise, the district court found that "[t]here is no basis to believe the evidence supporting eight of the ten counts would be suppressed." The district court noted that Graf had conceded that "a motion to suppress would not have affected the admission of the videos taken at The Gap."

The district court further found that it was "much too speculative" to suggest that Graf's trial counsel could have obtained a better plea deal than the one obtained. Instead, the district court noted that Graf's argument was based on nonviable hindsight. The district court also found that this was "a very high profile case" and that Graf had received "a favorable plea that resulted in probation." Thus, the district court concluded that the assistance provided by Graf's counsel was effective.

Thereafter, Graf filed a timely notice of appeal.

ANALYSIS

The sole issue presented in this appeal is whether the district court erred in denying Graf's K.S.A. 60-1507 motion. Through his appellate counsel, Graf contends that the search warrants issued by the district court in this case were overbroad and that trial counsel was ineffective due to his failure to file a motion to suppress the evidence seized during the execution of the warrants. In a pro se supplemental brief, Graf also contends that items were illegally seized from his person incident to his arrest.

8

In response, the State contends the district court's conclusions about the effectiveness of Graf's trial counsel are supported by substantial competent evidence. The State argues that a motion to suppress would not have succeeded because the search warrants were not overly broad under the circumstances presented in this case. In addition, the State asserts that any deficiencies in the specificity of the warrants were cured by the supporting affidavits and the presence of the affiant, Detective Slifer, at the time the warrants were executed. Finally, the State suggests that under the good-faith exception, the evidence should not be suppressed.

When a district court denies a K.S.A. 60-1507 motion after holding an evidentiary hearing—as the district court has now done in this case—we apply a mixed standard of review. We first must determine whether the district court's findings of fact are supported by substantial competent evidence and are also sufficient to support its conclusions of law. Substantial evidence is relevant evidence that a reasonable person could accept as adequate to support a conclusion. See *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019). On appeal, we are not to reweigh the evidence or reassess the credibility of witnesses. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). If we find that there is substantial competent evidence, we must then perform a de novo review of the district court's ultimate legal conclusions. *Fuller v. State*, 303 Kan. 478, 485, 363 P.3d 373 (2015).

The Sixth Amendment to the Constitution of the United States—made applicable to the states under the Fourteenth Amendment—guarantees the right to effective assistance of counsel in criminal proceedings. *Miller v. State*, 298 Kan. 921, 929, 318 P.3d 155 (2014). The right to counsel is also protected by section 10 of the Kansas Constitution Bill of Rights. *State v. Cheatham*, 296 Kan. 417, 430, 292 P.3d 318 (2013). The purpose of this guarantee is to "'ensure that criminal defendants receive a fair trial.'" *State v. Galaviz*, 296 Kan. 168, 174, 291 P.3d 62 (2012).

9

To prevail on a claim of ineffective assistance of counsel, the movant needs to show "(1) that the performance of defense counsel was deficient under the totality of the circumstances, and (2) prejudice, i.e., that there is a reasonable probability the jury would have reached a different result absent the deficient performance. [Citations omitted.]" *State v. Salary*, 309 Kan. 479, 483, 437 P.3d 953 (2019); see *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674, *reh. denied* 467 U.S. 1267 (1984). Judicial scrutiny of trial counsel's performance is highly deferential, and we are to presume that an attorney's conduct fell within the broad range of professional assistance. *State v. Betancourt*, 301 Kan. 282, 306, 342 P.3d 916 (2015). The benchmark in evaluating a claim of ineffective assistance is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Bledsoe v. State*, 283 Kan. 81, 90, 150 P.3d 868 (2007).

The United States Supreme Court has recognized that "[t]here are countless ways to provide effective assistance in any given case" and that even the most seasoned attorneys likely "would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. As such, "Monday-morning quarterbacking is not a sport encouraged by the laws governing ineffective assistance claims. [Citation omitted.]" *United States v. Caracappa*, 614 F.3d 30, 48 (2d Cir. 2010). Instead, "'a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *State v. Davis*, 277 Kan. 309, 315, 85 P.3d 1164 (2004).

A defendant's Sixth Amendment right to counsel extends to the plea-bargaining process. *Lafler v. Cooper*, 566 U.S. 156, 162, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012). As in other phases of a criminal case, a defendant is entitled to the effective assistance of competent counsel during plea negotiations. 566 U.S. at 162. Although counsel plays an important role in the negotiation process, it is ultimately the defendant who has the

10

authority to determine whether to accept or reject a plea offer. *Flynn v. State*, 281 Kan. 1154, 1163, 136 P.3d 909 (2006).

In Kansas, courts use an objective standard of reasonableness in resolving a claim that defense counsel failed to file appropriate pretrial motions. As such, courts are to examine both the merits of the underlying issues as well as the reasons given by the attorney for not filing a particular motion. "When defense counsel has no sound basis to believe that a pretrial motion would have merit and has no reasonable evidence or argument upon which to base such a motion the failure to make it cannot be equated with ineffective assistance of counsel." *Chamberlain v. State*, 236 Kan. 650, Syl. ¶ 5, 694 P.2d 468 (1985).

Here, Graf argues that his trial counsel acted unreasonably by failing to seek to suppress the evidence obtained as a result of the search warrants issued by the district court to obtain information from his computer and other electronic devices. Significantly, Graf does not argue that his attorney should have filed a motion to suppress the evidence—including the images from the hidden camera—found in the dressing room at The Gap store. Likewise, it is undisputed that the search warrants were signed by the district judge and that they were supported by affidavits. Rather, Graf suggests that the search warrants were overly broad.

The language in a search warrant should be "sufficiently definite to enable the searcher reasonably to ascertain and identify the things authorized to be seized." *State v. Francis*, 282 Kan. 120, 126, 145 P.3d 48 (2006) (citing *Steele v. United States*, 267 U.S. 498, 503-04, 45 S. Ct. 414, 69 L. Ed. 757 [1925]). Importantly, the level of specificity required depends on the circumstances of each case. *Francis*, 282 Kan. at 126. A search warrant containing broad or even generic language can be held valid "'when the description is as specific as the circumstances and the nature of the activity under investigation permit.'" *Murray v. State*, No. 109,854, 2014 WL 3843092, at *11 (Kan.

11

App. 2014) (unpublished opinion) (citing *United States v. Hargas*, 128 F.3d 1358, 1363 [10th Cir. 1997]). As the Tenth Circuit Court of Appeals has noted, search warrants should "'describe the items to be seized with as much specificity as the government's knowledge and circumstances allow.'" *United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005) (quoting *United States v. Leary*, 846 F.2d 592, 600 [10th Cir. 1988]).

In *Crowther v. State*, 45 Kan. App. 2d 559, Syl. ¶ 9, 249 P.3d 1214 (2011), a panel of this court found:

> "The Fourth Amendment to the United States Constitution requires that a search warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings. A warrant for computer searches must affirmatively limit the search to evidence of specific types of material. Officers must be clear as to what it is they are seeking on the computer and conduct the search in a way that avoids searching files of types not identified in the warrant."

Officers conducting searches of a computer "'cannot simply conduct a sweeping, comprehensive search of a computer's hard drive.'" *State v. Rupnick*, 280 Kan. 720, 732, 125 P.3d 541 (2005) (quoting *United States v. Walser*, 275 F. 3d 981, 986 [10th Cir. 2001]). However, as a practical matter "because of individuals' ability to 'hide, mislabel, or manipulate files' . . . 'there may be no practical substitute for actually looking in many (perhaps all)' files and locations during a search of digital storage. [Citation omitted.]" *United States v. Perez*, 712 Fed. Appx. 136, 139 (3d Cir. 2017) (unpublished opinion). Based on a review of the search warrants and supporting affidavits, as well as the transcript of the evidentiary hearing on Graf's K.S.A. 60-1507 motion, we find the warrants were not overbroad in light of the type of investigation that the police were conducting.

At the evidentiary hearing, Detective Slifer explained that he attempted to maintain a balance between wording the language of the search warrant as narrowly as

possible with the need to search for hidden files containing images relating to the investigation into the hidden camera found in the dressing room at The Gap store. It is important to note that by the time the search warrants were signed, Graf had been identified as the person in the video who appeared to be installing the camera in the dressing room to record people changing clothes without their knowledge or consent.

Although the camera found in the dressing room had a memory card in it, there was no way to view the recording without a using a computer or similar device. Detective Slifer testified that any interaction between the memory card and a computer or similar device would likely leave behind "artifacts" that could be traced back to the camera found in the dressing room. In the supporting affidavit, he stated that he knew from experience that videos from hidden cameras, such as the one found in The Gap, are often stored on computers to which the suspect has exclusive access, such as computers in his home or office. Further, Detective Slifer pointed out that those viewing images on a computer or similar device have the ability to encrypt, mislabel, or otherwise disguise the files in order to make them more difficult to identify during a criminal investigation.

As Detective Slifer explained during his testimony at the evidentiary hearing:

> "Files can be hidden inside other files in a process called steganography. Files can be renamed and they can be put in hidden partitions. They can be encrypted. Mr. Graf did, in fact, have an encrypted drive that I saw. That was part of this case, a Western Digital encrypted drive. They can be deleted. They can be software programs that hide them or make them present as if they are deleted, taking special software to look at them. There are numerous ways to hide files on a computer."

Detective Slifer further testified that because such files are often hidden, it was important to have access to any files or history where evidence of the crime being investigated might be found on Graf's computer or similar devices. Here, the crime under investigation was the clandestine recording of images of people in various states of

13

undress in a dressing room at a clothing store. Accordingly, the crime being investigated included the creation, storage, transmission, and review of electronic data on Graf's computer or similar devices.

Detective Slifer was asked if the search warrant provided him the authority to look at other items that were not related to this criminal investigation. In response, the detective testified:

> "Obviously, if I run into another crime, to be honest, I would have gotten a piggyback [warrant]. I only searched for evidence of the breach of privacy, and that is borne out by the exam of the evidence I extracted. I would have gotten a piggyback if there would have been any other crime. But other than that, I didn't need another warrant to complete the examination for the breach of privacy."

Although the supporting affidavit for the first search warrant—covering the electronic devices that Graf kept at his home—did not identify a specific crime, it did contain detailed facts about the hidden camera found in the dressing room at The Gap and about the investigation. This included the fact that Graf appeared to have been the one who hid the small camera there. The supporting affidavit for the second search warrant—covering the electronic devices that Graf kept in his office—not only included the information contained in the first affidavit but also expressly identified breach of privacy in violation of K.S.A. 2012 Supp. 21-6101 to be the crime under investigation. Moreover, Detective Slifer testified that "[t]he affidavit limits me for the crime that I described to the Judge and I wouldn't have exceeded that."

In support of his position that a motion to suppress would have been successful, Graf cites *Crowther*, in which a panel of this court determined a search warrant to be overbroad. In that case, the defendant was convicted of attempted aggravated kidnapping, aggravated arson, aggravated battery, criminal threat, and seven counts of violating a protective order. Unlike this case, the crimes under investigation in *Crowther* were not

14

computer-related crimes. Although it was unclear what the law enforcement officers investigating that case were seeking to recover, they obtained a warrant to search the defendant's computer. In finding the search warrant to be overbroad, the panel found that it "allowed 'a general exploratory rummaging' through Crowther's computer hardware and software devices which the warrant requirement was designed to prevent. [Citation omitted.]" *Crowther*, 45 Kan. App. 2d at 567. Nevertheless, the panel ultimately concluded that the district court did not err in denying the defendant's K.S.A. 60-1507 motion because he failed to show prejudice. 45 Kan. App. 2d at 573.

We find it to be significant that the crimes under investigation in *Crowther* did not involve the creation, storage, or viewing of digital files. In this case, Detective Slifer was specifically looking for digital images or other information related to the small camera that was placed in the dressing room at The Gap store. As discussed above, such images can be—and often are—hidden in various ways on computers or other similar devices. Unlike *Crowther*, we do not find that the search warrants issued by the district court in this case "allowed a general exploratory rummaging" of Graf's computers but instead authorized a search in an attempt to find the images and other information related to the investigation of the camera hidden in the dressing room at The Gap store.

In construing the language of a warrant, context is important. See *United States v. Burgess*, 576 F.3d 1078, 1091 (10th Cir. 2009). Numerous courts have held that if the context necessarily limits an otherwise broad description of the items to be searched, the warrant is not invalid. See *United States v. Brooks*, 427 F.3d 1246, 1252 (10th Cir. 2005); *State v. Henning*, No. 115,832, 2017 WL 3837224, at *6-7 (Kan. App. 2017) (unpublished opinion) (recognizing broad language of warrant but noting that the warrant as a whole indicated the search should be limited to evidence of the crime of child pornography). Here, when viewed in context, the search warrants and supporting affidavits state the physical location of the search, the types of electronic devices to be

searched, and the nature of the investigation. In fact, the second affidavit sets forth the specific crime under investigation.

There is no dispute that Detective Slifer—the person who signed the supporting affidavits under oath—was present and executed the search warrants. It is also undisputed that Detective Slifer signed the search warrant returns as well as the inventory sheets setting forth the items that were seized. In addition, as discussed above, he testified at the evidentiary hearing about his involvement in obtaining and executing the search warrants. Consequently, we find that any vagueness in the search warrants was cured by the attached affidavits and the affiant's direct involvement in the execution of the warrants. See *State v. Dye*, 250 Kan. 287, 290-91, 826 P.2d 500 (1992) (failure to indicate which unit of residence should be searched cured by information in the affidavit and the fact that the affiant of the affidavit was present at the execution of the warrant).

Furthermore, the good-faith exception to the exclusionary rule applies in cases in which an officer reasonably relies on the validity of the search warrant and the warrant is later found to be invalid. *State v. Hoeck*, 284 Kan. 441, Syl. ¶¶ 1, 2, 163 P.3d 252 (2007); see *United States v. Leon*, 468 U.S. 897, 908-09, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). The primary purpose of the exclusionary rule is to deter police misconduct. *State v. Sanders*, 310 Kan. 279, 300, 445 P.3d 1144 (2019). The exclusionary rule should not be used to bar evidence obtained by law enforcement officers acting in objectively reasonable reliance on a search warrant issued by a detached and neutral magistrate unless:  (1) the magistrate issuing the warrant was deliberately misled; (2) the magistrate wholly abandoned the detached or neutral role of a judge; (3) there was so little indicia of probable cause contained in the supporting affidavit that it was unreasonable for the officers to believe the warrant was valid; or (4) the warrant so lacked specificity that officers could not determine the place to be searched or the items to be seized. *State v. Zwickl*, 306 Kan. 286, Syl. ¶ 3, 393 P.3d 621 (2017); see *Burgess*, 576 F.3d at 1096

16

(good-faith exception applied where officers confined search to evidence of the crime and made every effort to comply with the law at every step of the investigation).

In this case, there is no allegation of misconduct by either the police or the district court. Rather, a review of the record reflects that the investigating officers attempted to comply with the law in preparing the supporting affidavits as well as in executing the search warrants. Moreover, Detective Slifer testified: "When I searched data, I was searching for evidence of a crime as listed in the affidavit, the voyeurism, the eavesdropping, and I looked in places that would . . . possibly contain evidence of that." There is nothing in the record to indicate that Slifer rummaged through all of Graf's personal information or attempted to uncover unrelated criminal activity. Instead, the record reflects that Detective Slifer acted in good faith and consistent with the information supplied to the district court in the supporting affidavits. Under these circumstances, we agree with the district court that it is likely that the good-faith exception would have prevented the suppression of the evidence obtained from Graf's computers and other electronic devices.

After considering the evidence presented at the hearing, the district court found that the search warrants were not overly broad and that it was unlikely that the evidence seized pursuant to the warrants would have been suppressed. The district court also noted that Graf had conceded that "a motion to suppress would not have affected the admission of the videos taken at The Gap." Furthermore, the district court found that it was "much too speculative" to suggest that Graf's trial counsel could have obtained a better plea deal than the one obtained. Ultimately, the district court concluded that the assistance provided by Graf's trial counsel was effective and that he assisted his client in negotiating a good plea deal that allowed Graf to avoid a prison sentence on these charges. We find that the district court's findings of fact are supported by substantial competent evidence and that the district court appropriately applied the law relating to a claim of ineffective assistance of counsel.

17

Even if Graf had shown that his trial counsel was ineffective for failing to suppress some or all of the evidence seized pursuant to the search warrants issued by the district court, he has failed to show any prejudice resulting from his attorney's allegedly deficient performance. It is important to recognize that Graf failed to present any evidence to establish that he was prejudiced by his attorney's failure to file a motion to suppress in the underlying criminal case. Although he was present, Graf did not testify at the K.S.A. 60-1507 hearing. In addition, Graf has not even identified what specific evidence he believes should have been suppressed. See *State v. Williams*, 299 Kan. 509, 539, 324 P.3d 1078 (2014) (appellate courts do not independently search the record or attempt to guess the facts the appellant believes support his or her general allegations), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016).

As indicated above, even if the district court suppressed all of the evidence obtained as a result of the search warrants—which is unlikely—the State still could have presented an overwhelming amount of evidence of multiple counts of breach of privacy. This evidence included the discovery of the camera hidden in the dressing room, the images of female victims in various states of undress, the images of Graf placing the camera in the dressing room, the fact that Graf returned to the store, the items found in plain view in his car, the statements he made to the police prior to his arrest, and the statements made to the police by his wife. As the State points out, it is unlikely that a motion to suppress would have excluded the evidence supporting the charges to which he ultimately pled, which related to hiding the camera in the dressing room and to filming his wife without permission. In fact, Graf appears to acknowledge in his brief that the evidence supporting these charges would still be admissible. Instead, he suggests that his bargaining position may have changed if some of the evidence had been suppressed. Thus, based on our review of the record, we conclude that Graf has failed to establish prejudice.

In a supplemental pro se brief, Graf also challenges the pat down search conducted by Officer Leitner following his arrest. At the evidentiary hearing, Officer Leitner testified that he patted down Graf after placing him under arrest. In doing so, he found an iPod and two small memory cards. Although the district court noted that the mandate from this court was restricted to the suppression of evidence seized as a result of the search warrants, it allowed questioning regarding the search incident to arrest over the State's objection. Our review of this court's previous opinion confirms the fact that the mandate was restricted to the sole claim regarding the search warrants. See *Graf*, 2017 WL 2610757, at *6.

Under the search incident to arrest exception to the warrant requirement, a law enforcement officer making a lawful arrest can search the arrestee and the area within the arrestee's immediate control without obtaining a warrant. See *State v. Torres*, 308 Kan. 476, 484, 421 P.3d 733 (2018). This exception to the warrant requirement has two purposes: (1) protecting officer safety by allowing a search for weapons an arrestee could reasonably access; and (2) preventing an arrestee from destroying or concealing evidence of the crime of arrest. 308 Kan. at 482-83 (citing *Chimel v. California*, 395 U.S. 752, 763, 89 S. Ct. 2034, 23 L. Ed. 2d 685 [1969]). After reviewing the officer's testimony and the video of the arrest, we believe the search of Graf's pockets immediately after he was placed under arrest falls within this exception.

In addition, a review of the record reveals that Graf's trial counsel was not asked about the search incident to arrest. As such, there is no evidence to support Graf's contention that the search was illegal, nor is there evidence regarding the thought process of Graf's trial counsel regarding this issue. Without more, we conclude that even if the issue was properly before the district court on remand, Graf has failed to establish deficient performance or prejudice relating to the failure to file a motion to suppress the evidence seized during the search incident to arrest. Where a movant cannot demonstrate the prejudice prong of *Strickland*, the court need not consider whether error actually

19

occurred. See *Edgar v. State*, 294 Kan. 828, 830, 283 P.3d 152 (2012). Prejudice is demonstrated by a showing that there was a reasonable probability that, but for counsel's error, the outcome of the hearing would have been different. 294 Kan. at 829. Graf has not met this standard.

Affirmed.